Brad Price for the defendant. May it please the court, counsel. The government's use of false testimony to secure a 480-month sentence requires a new trial in this matter. The fighting issue at this jury trial was not whether heroin killed Ms. Wilder, but in fact who distributed the heroin that did so. The false testimony of a Preston McCulley went directly to the heart of that fighting issue. The problem for the government in this case was that the victim, Ms. Wilder, unfortunately was receiving heroin from a number of different people. The evidence at trial showed that Preston McCulley was one of them. Preston McCulley testified for the government, and during the course of his testimony he lied about two critical things. First, he lied about his relationship with Ms. Wilder. He lied on direct and he lied on cross. Second, he lied saying he never distributed any controlled substance to Ms. Wilder. Again, lying on direct and lying on cross. The evidence at trial showed with photographs and with text messages that Mr. McCulley distributed heroin to Ms. Wilder. The evidence at trial also showed that on a prior occasion, just a few days before Ms. Wilder passed away from an undisputed heroin overdose, she was with Preston McCulley in a car looking for heroin. The falsity of the testimony was evident right when it was uttered. But even giving the government the benefit of the doubt, as the trial progressed and the government's own witnesses testified, yes, that's a corner baggie of heroin. What exactly was the false testimony? Did he testify that he didn't distribute any to her? That's correct, Judge. He was asked directly on cross, are you saying you never distributed any controlled substance to Ms. Wilder? He said, that's right. So we submit that that falsity is plain. It's not ambiguous. It's not one of these cases where it's a failure of memory or some sort of inconsistency. The falsity is just plain. And I think at that point, it's incumbent on the government to correct it. But even if we give the government the benefit of the doubt, trials move quickly, there was plenty of time in subsequent witness testimony. How do we know the government knew that the testimony was false? Well, I think the record evidence bears that out. First, there's the plain evidence of a photograph of a baggie of heroin that was taken from Ms. Wilder's cell phone, paired with text message exchanges between Preston and Ms. Wilder about a heroin transaction on that day. It's the very type of evidence the government used to try to prove that Mr. Griggs distributed heroin to Ms. Wilder. So that's the first thing. The second thing is the government's own drug expert, Agent Meggers, testified that she interpreted those text messages I just referenced, saying those text messages are Ms. Wilder trying to get another point of heroin from Mr. McCulley. I'm sorry. Go ahead. I was going to say, Judge, the government's drug agent, I'm sorry, case agent, testified interpreting those text messages saying, I'm sorry, looking at that photograph saying, yeah, it looks like a baggie of heroin. And did all of that come out either during cross-examination of McCulley or in other testimony? So the testimony I just referenced came out in subsequent examination. So Mr. McCulley took the stand and lied on direct and lied on cross. He was confronted with the text message exchange I'm talking about, denied any involvement with it. He then left the stand. Because, of course, if he's going to deny it, you know, practically speaking, there's only so much one can do with cross. So once he's off the stand, subsequent witnesses were asked about the same sets of evidence. And those subsequent witnesses for the government said, yes, that looks like a heroin transaction. That looks like a baggie of heroin. That looks like a drug exchange. You know, and that to me is, I mean, so what happens in this trial is that McCulley lies and lies again. He's confronted with the document, denies it. And then other witnesses come in and testify that essentially he was lying. And, you know, even if we were to set that all aside, there seems to be a substantial amount of evidence that would point towards the guilt of your client otherwise. So why isn't the cross-examination and the subsequent evidence that was received sufficient to ameliorate the harm? So I think the answer to that is because the lie went directly to the fighting issue, directly to it. And the government's central premise was jury, the defendant's the only one that could have done this. He's the only one that could have done this. And so naturally the jury wants to hear from the other people that were demonstrably distributing heroin to the defendant. And when they testify and lie, the jury is necessarily affected by that. If it was a lie about timing or about quantity or about frequency, I would take the court's point. But our position is that the lie was so fundamental to the very thing that we were fighting about that factually it shouldn't be allowed to stand under this court's precedent. The government should be required to correct that lie. So what should the government have done in your view once it became evident that McCulley was lying? So they have some choices, right? First, they could have recalled Mr. McCulley. They could have prepped him, said, hey, you're not going to get in any trouble. We're not going to blow the whistle on you here, but you've got to tell the truth. Like we probably prepped you earlier. You've got to tell the truth. And they could put him back up and he could say, look, I was scared. I'm sorry, what have you. That would have been relatively easy to do. Secondly, they could have asked their own witnesses about it. They could have, you know, the options are open. But I think the easiest way would just be to recall Mr. McCulley. And I don't know, again, I don't know that that would have caused them any particular difficulty. The difficulty is that everybody knows that he lied. And, you know, talking about, well, he lied but no one should care, you know, I think minimizes the significance of the judicial proceedings. And it minimizes the severity of the punishment. And at a minimum, at a minimum, the district court could have held a hearing to satisfy the court's question, well, how do we know that he lied? And, look, if the government, you know, could present that this was a total accident, then that's one thing. But, you know, it wouldn't, well, the government knew a lot about these text messages. And I don't believe the government was as surprised as anyone that he lied. Mr. Price, what you just said was that everybody knew that he lied. And going to Judge Erickson's point, doesn't that essentially, with the cross-examination and all the other evidence that came out, doesn't that sort of squarely put the question in front of the jury to decide? I don't think that it does. In other words, if everybody knew he lied, how is this a material question? Well, when I say everybody, I mean the lawyers, I mean the court, I mean the investigators, I mean the case agents. But the jury sitting there on the other side of the box hasn't seen 85% of the evidence, won't hear 90% of what happened. They'll only hear the tailored version that the court deems admissible and relevant. And so the jury is looking at the government. The jury's not going to think the government put somebody up there to lie. They're just not going to. There's going to be a veneer of credibility with that. But once confronted with the text, the jury would have to have at least some reasonable question in their mind that this witness is lying, right? The other thing is there's two weeks. This text message is two weeks prior, right? And the jury could very easily have looked at that and review it in a light most favorable to the jury's verdict. They would say that's remote enough that you can't tie that particular delivery to the death in all likelihood, right? Because heroin addicts consume what they acquire relatively quickly, particularly when they're buying small quantities as this victim was. They could look at it that way, sure. They could also be considering, look, this could have been another distribution that happened. But we heard from him. He said he didn't do it. He said this isn't heroin. Maybe we're wrong. The thing we have to remember is, and I'm sure the court's well aware, when we look at these text messages, they're not always very specific. Ironically, the text messages to the defendant were very vague. The text messages to Preston and to these other folks were more explicit. I need H, Molly or H. Give me another point. Even with the court's point that users of this particular drug use right away, again, it's obviously not the defendant's burden to show a specific transaction that's the transaction. But the point is that we present a transaction two weeks ago, and this is certainly clear evidence that there's a reasonable alternative. And the jury, instead of being able to consider that, the jury, instead of being able to hear what's true, the jury hears falsity. And I would submit respectfully that that falsity was so critically important because, really, that's what we were fighting about. I read McCauley's testimony, but I didn't read the closing arguments. And I'll go back and do that. But was his testimony discussed in closing by either side? You know, Judge, I can't answer that without looking back at the words that I said. I apologize. I bet it was. And I think I take where the court's going. The question that the court seems to be asking is whether this is much ado about nothing because he was crossed, it was argued, and the jury got to make up their own mind. I understand that point. And, again, I think there are some lies that you can cross away. There are some lies that you can argue away. And I think there's a sliding scale there. And, you know, when we look at this court's body of law about false testimony, you know, the point that the court has made is that it really does go to the heart of these proceedings. And so our position is that we think we should look at the context. And, you know, if you step back a second and say, well, big picture, we're going to allow false testimony. And we're going to allow the government to use false testimony and to double down on false testimony because we're confident that defense counsel can effectively cross-examine. And then we hope defense counsel can effectively use that demonstrable lie in closing. And we hope that the jury is, you know, tuned in enough to find the lie. I'm just not comfortable. I don't think that approach to false testimony is consistent with precedent. And I don't think it's consistent with, frankly, with a just result in this case. So is there a prejudice standard that we apply to the false testimony? Or is it your position if it's false, it's false, you get a new trial? Well, that would be overstating it, Judge. The precedent in this court sets out the standard. And it's grounds for a new trial if the falsity was reckless or knowing or even negligent. It's grounds for a new trial if there is a reasonable likelihood that the testimony affected the judgment of the jury. This court has said that over and over again. And we're, of course, arguing that that is the appropriate standard. I think that's the settled law in this circuit. And I think that goes to the central point, reasonable likelihood that affected the judgment of the jury. Again, if this were a tangential lie, we wouldn't be talking about it. But this went to the very heart of the fighting issue. And I would submit there is a reasonable likelihood that it did affect their judgment. In my review of the closing arguments, it appears that you referenced in your closing argument a number of times, six or eight times, Mr. McCulley and his testimony. And the only response the government ever made or ever made, the only time that the government actually mentioned Mr. McCulley was in their rebuttal argument. And all they said in that argument appears to be that, but what does her phone tell us what happened to her on her final day? She wasn't talking to Preston McCulley. She wasn't talking to Matt Boehmler. She wasn't talking to Hart. And that's the only reference that's ever made by the government to McCulley. And so it doesn't seem like it became part of the fighting issue for the government. Well, I don't think it could. But I don't think the government, by that point, I believe the government knew that it was false. And I don't think the government, and I'll let my colleague correct me, but I don't think my colleague would harp on that. I think they were probably deciding what, if anything, needed to be done about it. Do they need to correct it? And they chose not to, which is their purview. But the fighting issue is who distributed the fatal dose, right? I'm not saying that the fighting issue is narrowly about Mr. McCulley. The fighting issue, right, is who did this? Everyone knows that the evidence was clear that heroin killed Ms. Wilder. But the evidence was very, very murky as to who distributed it. Recency is one thing. But the point that Your Honor made about the text messages, and if you go back and look at the record, Ms. Wilder was reaching out in the very days leading up to her death to multiple people. Now, yes, the evidence showed she had contact with Mr. Griggs. But the full context here shows someone who's desperate to get it from anywhere she can. And, of course, it's incumbent on the government to tighten it up and to show, beyond a reasonable doubt, that this is the only plausible route to get those drugs. And we submit they didn't do that. And they were aided by this false testimony. The false testimony helped to narrow that down. If you take that away, if Preston McCulley says, yeah, no, we got heroin sometimes. Well, was this one of the times you got heroin? Yeah. Is this how it worked when you got heroin? Yes. Yes, it is. And is this a picture of the corner baggie that you distributed to her? Yes, it is. That type of testimony can be powerful. Because then you have another seller in the courtroom sitting at the witness table 25 feet from the defendant. And we would submit that that does change the game. That certainly rises to reasonable likelihood that it could affect the jury. It's not the same standard as the court has in other contexts where the outcome needs to be different. The standard is just reasonably likely to affect the judgment of the jury. So the court would have to say, there is just no way that any jury could ever reasonably be affected by that kind of testimony. I just can't see how that would be the case. I did want to mention just briefly that the jury instruction issue dovetails with the false testimony issue. The court changing, essentially, moving away from this court's model instruction and using causation as a special interrogatory is a significant departure from the articulation of the elements by the Supreme Court in Burrage. And I think it did affect the jury's understanding of what the government was required to prove as to count one. So I think when you take that reformulation of the charge and you map it on to the false testimony, and I won't belabor the other points in our brief, but there is a real issue here with the cumulative effect of these things. With that, I'd like to reserve my remaining time for rebuttal. Thank you, Mr. Price. Please, the court, counsel. I'll start where Mr. Price left off on the jury instructions. The defendant doesn't have any objection at all to the jury instruction language, to actually using the examples from the Supreme Court in Burrage on what it means to be but-for causation or what it means to be a sufficiently independent cause. But his concern is that it should have been done as a greater offense and a lesser included offense. And being an old attorney who tried cases before Apprendi and after, the use of special interrogatories for Apprendi-driven factual findings is actually easier for a jury to understand and easier for counsel. I'll give you an example. Let's say, for instance, you've got multiple Apprendi-driven factors, because death is an Apprendi-driven factor, because it says if death results, then the penalty changes. That's the same as a drug quantity. It's an Apprendi-driven factor. It's the same as a protected location. It's an Apprendi-driven factor. If you've got multiple Apprendi-driven factors in a case, you could ultimately have, say, 280 grams of crack near a park. Well, then you've got, I think that's six, if my math's right. That's at least six different alternatives you'd have to instruct as a lesser included offense. That is a huge encumbrance and will confuse the jury. Whereas, since the crime that they really need to look at was their distribution, that's the simple offense. And then if you find that, if you don't find it, you're done. If you find it, then you go on to make these other factual findings beyond a reasonable doubt with unanimity. And I know the district court judge that I practiced in front of, when Apprendi came out, helped develop that system, and I think it's worked pretty well over the course of time. This is Judge Malloy's laughing. I think he remembers that that was him because I think I had the last pre-Apprendi case in the district where we proved a huge quantity of crack on a guy and ended up having to capitulate a 20-year sentence because we hadn't made the judge the findings. To look at the testimony of Preston McCulley, I think we need to put this into context to start with what the case is about. August 31st, 2018, Abby Wilder contacted a defendant and got heroin from him, and she was found dead the next day. An 18-year-old woman. They were actually going to search one of her phone, unlock the code, and look for kind of the last, because heroin users always use, especially when they're buying tiny quantities like a point of heroin, they use it immediately. There's abundant testimony in the record about that. So look for the last person, look for that last transaction, look for that last day. That's really the key time period. The context showed that there was numerous conversations between Abby and the defendant that resulted in her going to meet him, pick him up at his residence at Dewar, Iowa, drive him around. And while she was driving around with the defendant, she was talking to her boyfriend, who happened to be in the county jail. So all those calls are recorded, where she's describing what the defendant was doing, what she was trying to do, and what she was planning on doing. And it's clear that she was getting heroin at that time. You can see that when she's looking to go, when the defendant tells her to go to Dewar, she actually looks up Dewar on her phone to try and find it, because Dewar is a little tiny town near Waterloo. And she didn't know where it was. So we know that the defendant was a heroin source that day. Now Mr. McCulley, defendant in argument, tried to present that Mr. McCulley was really the alternate source on that day. Because it wasn't just a text message from August 12th. And it wasn't just a photo on Abby's phone of what could be heroin. Without a drug test, you can't really tell. It looks like heroin, could be heroin. He also had a map. Because the location they met at on August 12th, you know, some, what, 14 days? I don't do public math very well, but in front of, before the day of her death, was a park. His argument was that even though there was no contact, no communication, no text messages, no record of phone calls, nothing between Abby and Mr. McCulley, that she must have left her residence and walked to that park. And met with McCulley there, and maybe he was the source. So Mr. McCulley's prevarication on the stand really fed into the defendant's argument. They had this other drug dealer in the room. Because Jessica Mizell, she also was a person who provided drugs to Abby. She was very straightforward about what it was. She was the intermediary between the defendant and Abby until she stopped using on August 24th because she had a death in the family. She described the last event that she was with Abby and the defendant, that Abby got angry because there was no drugs. And that's corroborated by Tavon McMullen, or TM, who was with the defendant, or friends of the defendant, who describes her coming out of the bedroom saying, there's no drugs, I'm out of here. And they had to calm her down to get her there. That event is actually discussed in the text messages as well, about the last time I saw you. I was angry. So, then once the death occurs, the phone is opened by the police. The police then use that phone within hours of her death, or texting the defendant to get more drugs, which is common for a heroin user to try and use every day, if not multiple times a day. So, try to get more drugs, get them to come pick up. Now, we knew that Mr. McCulley was potentially someone that the defense was going to try and claim was the drug dealer. Because he was with Abby on the 28th when she was talking to her boyfriend. He actually talks in the background and uses his name, Preston. When the defendant shows up after the police text him on the 1st of September, he shows up at the location to pick up Abby, follows the directions to actually get there, has the phone with him that not only has the text conversations with Abby, but also shows text communications with others and photos that are indicative of drug trafficking. When he's confronted about why he's there, first of all, he's not there for anything. He's just parking. Then he doesn't know anybody who's there. Then he doesn't know Abby at all. Then he knows Abby. Then he admits that he's seen Abby and he is sorry the day before and actually used drugs with her. But it was all about sex. Everything was about sex. And when he's interviewed, and I would suggest the court watch the... to get down to the salient points, I would encourage you to watch it. Because his story, when the officer is reading him the text messages, things like, well, what does this it mean? He claims that it meant a part of his anatomy used for sexual congress. And he's talking about other people are going to come get it? So it won't be available for you? I mean, it's nonsensical. The defendant was absolutely the source of supply. And then when the defendant gets into jail, he makes multiple admissions to other inmates that not only was he a heroin dealer, that he gave heroin to Abby, to a woman who died, and he ended up answering texts to her phone the next day. So his admissions in jail dovetail with that timeline. And when you look at McCauley's testimony specifically... So, Mr. Reiner, Mr. Price, I think, seemed to suggest that you wouldn't contest the falseness of McCauley's testimony. Is that right? His testimony was murky. At the time when it occurred, because we were looking at really the timeline of that August 31st, and we were not focusing on an event. Didn't your own expert testify that there was a drug transaction between the two of them? That the text message certainly showed a... I can't remember if she said it was a drug transaction or it would be consistent with a drug transaction. But text messages on meetings with drug dealers, it certainly would show a meeting between the two or plans to meet at a particular location. And at least one of the texts talked about, do you have that other point, which would be probably consistent with drug-seeking behavior. I'm not sure that the expert went as far to say that this was a drug transaction, but the communications would be consistent with that type of activity. I'm not sure I answered the court's question. I think that's right, as were the texts and the baggie and the other evidence that was there. I guess what I'm getting at is Mr. Price suggests you had a duty to correct the testimony. And what's your response to that? Well, I think we did try to correct his, at least his initial, on page 86 he says, did your friendship involve controlled substances? He says, no, not really. We pushed him a little bit during that questioning of, well, you knew that she used controlled substances, you used controlled substances, you communicated with one another about controlled substances. So that was all, you know, when we pushed back and he said yes to all of those. So their friendship really did involve using controlled substances. So that first piece, you know, we did confront him with. When we were asking the question about, you know, did you provide, as I recall, my recollection was we were trying to ask the question about, in that week before, you know, from that 28th on kind of time period, to narrow it to the time of the death. When we asked the question, we weren't thinking about, you know, sometime earlier because, you know, a picture of drugs on an individual's phone, you know, a text message, you know, two, three weeks earlier, really was a collateral matter to us. I didn't catch it in the speed of trial. Looking in hindsight, reading the transcript, he probably did lie about whether he did provide, and in part that may be because we used the word provide. In my experience as an old-time drug attorney, sometimes people will talk about, you know, giving, providing, but that doesn't include sharing. You know, sharing is a whole different deal. So, you know, had that question been tighter, we maybe could have gotten to that next piece. In hindsight, maybe we should have asked that, although ultimately defense counsel made everything he needed out of that no matter what. Because even, you know, even if Mr. McCulley said, yep, we met two weeks earlier and I gave her heroin, but I didn't on this occasion, we're in the same place we are factually now. Because he's still going to argue that there was a secret meeting at a park where Abby walked with no communication on August 31st, because that's the fighting issue. The fighting issue is not did Preston McCulley distribute three weeks before, did he share with her three weeks before. The fighting issue was who distributed the heroin on the day she died that caused her death. So ultimately, it was not entirely clear when he testified, at least in my view. And defense counsel, you know, sometimes there are witnesses who just refuse. You could ask him a hundred times, did you distribute, did you provide, and he may just buckle down, and that doesn't really get you anywhere either. So that's why we tried some of the other techniques to try and get at, get him to admit that their relationship involved more than that, to kind of bring him along, and ultimately having a defense attorney hit him a little bit, sometimes will shake a witness loose as well. But you also asked him if he knew where Abby was getting her drugs, and he said no, he didn't know. Correct. Which is obviously not true from the text messages, because they were getting them together. They were, well, I'm not sure who they were waiting for. That's, the 28th is an interesting conversation, because she was contacting a number of different people trying to seek heroin, and I'm not sure that they were waiting to get heroin from any particular person on that day, or if she was trying, you know, waiting for somebody to contact her back to say that they had heroin, because she was in communication with the defendant at that point where he was talking about getting heroin in the near term. So at least when I read that text message, I wasn't thinking they were sitting outside a drug house waiting to walk in. I was thinking it was more of a philosophical, we're waiting to get some drugs. But if you go back to the text messages from August 12th, it's pretty clear that they were getting drugs together at that time. I think the August 12th one clearly looks more like a drug-type text. Now, Mr. McCulley also said he was using a lot of Xanax, and he says that messes with your memory, and he doesn't really remember a whole lot. It's hard to, it would be hard to pin him down, I think. One of the arguments you make is that, well, you really shouldn't expect somebody to admit to a felony. So the line's okay, I guess. But, I mean, if you know he's committed a felony and he's going to lie about it, then you shouldn't use him, should you? Or you should give him use amenity, which you have every right to do. Sometimes you don't know exactly what a witness is going to say until they get on the stand. We have Ms. Mizell certainly laid bare absolutely everything she did. She was deep into recovery at that point. She had been clean for quite a bit of time. Mr. McCulley, I don't think, had quite been down that path to get to the point where he was willing to admit everything that he had done. But regardless of whether he was on the stand or not, he was going to be a central part in the defendant's defense to claim that he was the source of supply, he was the boogeyman. And having a jury see that person, I think, makes sense. But really, him being a source on August 12th is a purely collateral matter. And under the standard, if it's a knowing, reckless, or negligent use of false testimony, it's only if it's a reasonable likelihood that the verdict was affected can you order a new trial. If it's an innocent use, then only if acquittal would probably have resulted in a new trial. In this case, the district court judge who sat, watched this real time, heard the arguments real time, saw the evidence real time, found that it was an innocent use, but also looked that under either standard, the evidence is such that no new trial was warranted. And the district court did not abuse its discretion in denying the new trial on that ground. Well, subject to your questions, I have nothing else I need to do. I don't feel required to use all of my 20 minutes. Very well. Thank you, Mr. Reiner. Mr. Price-Rabatel. Thank you. Just briefly, I would direct the court to, I believe I quoted the transcript in my reply brief at page 4, the drug agent, Agent Megger's, testimony was that when Abby Wilder requested, quote, at a point in the text messages, she was, quote, asking if she can get another point of heroin, a tenth of a gram, when she gets off at 4. That's RDOC 176 at 359. Again, I don't think there should be a dispute about the falsity of the testimony or the government's knowledge about its falsity. I think we need to step back a little and consider this more broadly. Of course, the defendant doesn't have to prove up a specific drug transaction. The defendant doesn't have to show, in other words, the defendant's inability to show a particular drug transaction with a particular proximity to the death doesn't somehow absolve the government of its obligation to correct false testimony. I think that's important to point out. They're trying to link the fact that these text messages are two weeks prior to the death. So we're still entitled to truthful testimony about them. And I think, again, the critical nature of the lie is the point here, not whether the defendant could prove something, which, of course, the defendant doesn't have to do. I do have one question about the jury instructions. It's my understanding that you are not objecting to the content in jury instruction number 15, that you agree that it is a fair and accurate statement of the law. Is that true? No, Judge. I'm glad you asked that question. We objected wholesale to the jury instruction. We said we object to the jury instruction that's given, and we proposed our own jury instruction. Indeed, you did. But you did not object to the substance of 15. You did not make a claim that it was an inaccurate statement of law. What your claim was, as I understand it, maybe I'm wrong, was that if you look at the essential elements instruction in 14, that the failure to include the but-for causation requirement in causing death as part of that was inappropriate. Then you turn around and say that you should have had a lesser included. But, in fact, the jury verdict form inherently includes a lesser included, because it asks the first, did you distribute heroin? And the answer is guilty or not guilty. They say guilty. The next in a special interrogatory is the jury is on the but-for causation piece. Did it cause the death? And they said yes. And so had they answered guilty on the first interrogatory, been guilty of distribution, said no on the second interrogatory, you'd have been convicted of the lesser included offense, right? Am I missing something? Judge, can I? I see my time has expired. Can I answer? Yes. So, Judge, with respect, I think you are missing my argument, or I didn't present it clearly enough. But I think that we did. I think that we argued in the district court. We object to instruction 15. We object to it because it's an incorrect statement of the law. And we've argued in this court it's an incorrect statement of the law. It's an incorrect statement of the law because our proposed instruction had a third element. Element three, Abby Wilder would not have died but for her use of the same heroin distributed by her to the defendant. To or by the defendant. That causation element is absent from instruction 14, I guess, is the element's instruction. Yeah, it's absent in 14, but it's in 15. And so in the totality, it's a fair instruction on the body of law. And the question really is, is it an essential element to distribution? And the answer is, I think not. That it's an element only if you're going to get convicted of the enhanced penalty, which under Apprendi is a question that's got to be submitted to the jury. It was. Well, it sounds like you've made up your mind, Judge. So the record's clear. Our argument is that the instructions as given were not accurate statements of the law, that the elements do require that causation be articulated to the jury as an element. The Supreme Court says these are elements. They should be articulated as such. And burying it in an interrogatory as if it's a drug quantity question, it may be consistent with a laying, if that's your concern, but it's not consistent with Burrage, which is the more specific precedent that we have to follow here. And so I think, just to be clear, our argument is not just form. It's not a form argument. It's a substance argument that the instructions as given were incorrect statements of the law because they did not articulate as elements of the offense the aspects of the statute that are set forth by the Supreme Court in Burrage. Very well. Thank you, counsel. We appreciate your appearance and argument today. The case is submitted, and we will issue an opinion in due course.